IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 7:16-cr-00022 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| ALLAH TRUTH KELLEY | ) | United States District Judge |

**MEMORANDUM OPINION**

Pending before the court is defendant Allah Truth Kelley's motion to suppress. (Dkt. No. 52.) The motion has been fully briefed, and the court heard evidence and argument at a July 27, 2016 hearing. In his motion, Kelley moves to suppress physical evidence seized from Kelley and from the vehicle he was driving on January 28, 2016, on the basis that the police did not have reasonable suspicion to stop and seize him at that time. He also moves to suppress both statements he made during the course of the January 28 stop and statements he made on March 18, 2016, when he was arrested at his home. As to both sets of statements, he argues that they were obtained in violation of his constitutional rights and prior to his being given *Miranda*[1] warnings.

At the hearing, the court ruled that the stop on January 28, 2016, was a legal stop under *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968), and thus that the two guns and a small amount of marijuana seized at that time would not be suppressed. The court noted that it would issue a written opinion setting forth the reasons for its ruling. The court took the portion of the motion regarding Kelley's statements under advisement. Following the hearing, the court was advised that Kelley intends to plead guilty to the pending charge. The motion to suppress with regard to the statements will be moot if Kelley enters a plea of guilty, so this opinion sets forth only the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

reasons for the court's denial of the motion as to the January 28 stop and the physical evidence seized from Kelley and from the vehicle he was driving.

I. BACKGROUND

A.  **Events of January 28, 2016**

At approximately 8:43 p.m. on January 28, 2016, the 911 call center for Roanoke City received a call from Anastasia Green of 2090 Indian Village Lane, SE, who reported that Allah Kelley was refusing to leave.[2] (Mot. to Suppress, Ex. A, Incident Recall Report, Dkt. No. 52-1.) The call center dispatched police units from the Roanoke City police to the address, noting noted that Ms. Green kept "yelling out get [someone] on the way." (*Id.* at 1.) The initial call was disconnected. (*Id.*) The call center called back once, but received no answer, and then called again, at which point Ms. Green "made statements about [Kelley] tearing up her house," said "that they coming to get you don't leave now," and "said something about a gun and hung up." (*Id.*) Dispatch called back again. This time, Ms. Green made statements that dispatch relayed as, "suspect is leaving in a white Chrysler 300 [and] he has 2 guns on him." (*Id.*) Ms. Green described what Kelley was wearing and the direction he was heading, and also told dispatch that he was driving the car and that he had a restricted license. She refused rescue, but said that "he took her TV down" and that Kelley was her child's father. (*Id.*; *see also* Mot. to Suppress, Ex. B, audio recording of 911 calls, Dkt. No. 52-2.)

All of this information was conveyed to Officer M.N. Getz and Officer B.C. Adams (who was a field training officer for Getz), through their in-car computer, before they stopped Kelley.

---

[2] The factual background is taken largely from the parties' exhibits, which include a dashcam video of the entire stop, as well as a printed copy of what was relayed to responding officers through their in-car computer, and an incident report prepared after the stop by the responding officers. The court also refers to testimony from the suppression hearing.

(Incident Recall Report; Suppression Hr'g Tr. ("Tr.") 10–15, 49–53.[3]) Officer Getz, who was driving, proceeded to a nearby intersection to see if a white Chrysler was heading from the direction of Indian Village Lane toward them. They observed a white, newer-model Chrysler, and Officer Getz was able to catch up quickly and turned on the patrol car's emergency lights to initiate a traffic stop. As noted, the initial 911 call was received at 8:43 p.m., and the traffic stop was made approximately five minutes later, at 8:48 p.m. (*Id.* at 45.)

Officer Getz testified that she and Officer Adams stopped Kelley in order to further investigate the incident they learned about from dispatch and also for the safety of the public. (*Id.* at 56.) Similarly, Officer Adams testified that they executed the stop to further investigate what was being dispatched to them, which, based on all of Ms. Green's comments, indicated a "domestic disorder that had escalated."[4] (*Id.* at 19.)

Kelley, who was the driver and only occupant of the car, pulled over almost immediately. (Mot. to Dismiss Mot. to Suppress, Ex. 3, Dash Cam Video Recording, Dkt. No. 57-3.) Before Officer Getz parked her car, Kelley exited the car and walked toward the patrol car. *Id.* Officer Getz yelled to Kelley to get in the car at least two times. *Id.* When Officer Getz observed him attempt to place his right hand in his pocket, she ordered him to get his hands out of his pockets. (Def.'s Hr'g Ex. 1, Incident Report 4.) He took his hands out of his pockets, but did not return to

---

[3] All references to the suppression hearing transcript are to an unedited, realtime version provided to the court by the court reporter.

[4] At the hearing, defense counsel extensively cross-examined both officers concerning the report that Officer Getz had written after Kelley had been found with the guns and arrested for being a felon in possession of a firearm. In his argument, defense counsel contended that the officers' credibility, and their reasons given for the stop, were undermined by the subsequent report because the report emphasizes Kelley's possession of guns and because nowhere does it expressly state that the basis for the stop was an escalating domestic disorder. (Tr. 98-99, 100-02.) The court disagrees and finds that both officers were credible on this point. The court believes that they stopped to investigate an escalating domestic dispute, as evidenced by the fact that the first question Kelley was asked during the stop was what had happened between him and his child's mother, Ms. Green. Further, the information the officers received from 911 and the incident report both refer to a domestic disorder (or at least to facts suggesting one). The court agrees with Kelley that the presence of the guns played some role in why the stop was made, but as explained elsewhere in this opinion, the police are not foreclosed from relying on the presence of guns, legally owned or not, when they have reasonable suspicion to believe that a person has committed another crime, particularly where that the circumstances of that crime involve a domestic dispute.

3

his car.  (Dash Cam Video Recording.)  Instead, he placed his hands in the air, walked to the side of his car, and placed his hands on the outside of the car.  (*Id.*)

According to Officer Adams, Kelley's immediate exit his car was unusual, and both officers also noticed that he was sweating an excessive amount, which was particularly strange since it was a cold night in late January.  (Tr. 19, 22, 55–56.)  As Officer Adams walked to the front of the car, he detected the smell of burnt marijuana from the opened driver's window.  (*Id.* at 21.)  At about the same time, Officer Getz approached Kelley and asked him what had happened between his child's mother and him.  (*Id.* at 55–56; *see also* Dash Cam Video.)

Kelley stated that he had gone to their residence at Indian Lane to get his stuff because he was moving out.  Officer Getz asked if Kelley had anything on him that she needed to know about, and Kelley pulled out a small bag of green leafy substance from his left front pants pocket, saying, "[a]ll I have on me is this little bit of weed."  (Tr. 56–57; Incident Report 4.)

Getz then proceeded to search Kelley and his articles of clothing.  She found $1,308 in U.S. currency, but did not find any additional drugs or any firearms.  (Incident Report 4.)  During the search of his person, she asked if there were any firearms in the car, and Kelley stated: "I don't know, it's not my car.  My friend let me drive it."  He also offered: "I don't search cars before I get in them and drive them, so if you find something in that car, I didn't know about it." (*Id.*)  After she finished searching him, Officer Getz told Kelley he was in investigative detention, and she handcuffed him, with assistance from other officers.  (*Id.*; *see also* Tr. 73–75; Dash Cam Video.)

Because of the marijuana Kelley had handed over and the smell of burnt marijuana from the car, the officers searched the Chrysler, recovering two loaded, semi-automatic firearms from the glove compartment.  (Dash Cam Video; Incident Report 4.)  As the guns were being removed

4

from the vehicle, and without any question directed at him, Kelley stated that the firearms were not his. (Incident Report 4.) He later volunteered: "I know I am going to jail because I am a felon." (*Id.*; Tr. 75–76.) After learning that Kelley had been convicted of two prior felonies, the officers arrested him. At no time did any officer give Kelley *Miranda* warnings. (Tr. 74.)

**B.     Events of March 18, 2016**

On March 18, 2016, Officer Reed, who served on a U.S. Marshal Fugitive Task Force, went to Kelley's apartment with a warrant for his arrest on the criminal complaint in this case. (*Id.* at 79.) Officer Reed and other officers conducted surveillance, but did not see Kelley emerge. (*Id.*) Officer Reed knocked on the door, which was opened by Kelley's daughter, a teenage minor. (*Id.*) She told Officer Reed that Kelley was in the bedroom of the residence. Officers went into the bedroom and took Kelley into custody without incident. (*Id.* at 79–80.)

After Kelley was arrested at his home and before he was given any *Miranda* warnings, Officer Reed asked Kelley if he wanted to come with him and talk, or come with him and give a statement. Officer Reed also stated that he had only the police department's side of the story. (*Id.* at 80.) In response, Kelley told Officer Reed that the firearms were not his; they belonged to his brother. Kelley also stated that the firearms had been taken by the police and that his brother had just gotten them back. (*Id.* at 80.) Officer Reed then asked Kelley if he meant the city police department, and Kelley responded "yes." (*Id.*; *see also* Mot. to Suppress, Ex. 3, Detention Hr'g Tr. 6, 12, Dkt. No. 52-3 (Officer Reed's testimony to the same basic effect).) At no time during the encounter did Kelley receive *Miranda* warnings. (Tr. 82.)

II. DISCUSSION

The Fourth Amendment guards against "unreasonable searches and seizures," U.S. Const. amend. IV, and the stop here implicates the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19–

5

20 (1968). As an initial matter, the parties appear to disagree as to whether the court should even analyze this encounter as a stop pursuant to *Terry*. The government contends that this was an investigative *Terry* stop. Kelley counters that the report from Ms. Green to the police alleged only completed misdemeanors—a concluded trespass (since Kelley had left the premises) and possibly destruction of property, which had also ended. He further argues that his possession of guns could not be assumed to be unlawful here, an issue the court will reach shortly. Thus, he contends that the officers could not arrest him without a warrant, citing to Virginia Code § 19.2-81 for support. (Mot. to Suppress 6); *see also* Code § 19.2-81 (permitting officers to conduct warrantless arrests for the commission of any crime in the officer's presence and the commission of felonies outside the officer's presence, if the officer has reasonable grounds or probable cause to suspect the commission of a felony).[5] In short, because there was no reasonable suspicion of any ongoing criminal activity after he left the apartment, and no reasonable suspicion of the commission of any felony at all, Kelley argues that the police were not permitted to stop and seize him without a warrant. (*Id.* at 9.)

The court is not persuaded by Kelley's arguments. First of all, Kelley's contention that a *Terry* stop may not be conducted based on a completed crime, or at least not based on a completed misdemeanor,[6] is not accurate. At the hearing, the court asked defense counsel the

---

[5] The provision also allows officers to arrest for specific other misdemeanors, but it does not appear that the completed offenses of trespass or destruction of property would fall within any of the enumerated offenses.

[6] In *United States v. Hensley*, 469 U.S. 221 (1985), which is not cited by either party here, the Court held that an officer was permitted to conduct a *Terry* stop based upon reasonable suspicion "that a person they encounter was involved in or is wanted in connection with a completed felony." *Hensley*, 469 U.S. at 229. The *Hensley* Court expressly declined to decide whether a completed misdemeanor could suffice, *id.*, and there is not a Fourth Circuit opinion addressing this issue. *Cf. United States v. Harris*, 584 F. App'x 164, 165 (4th Cir. 2014) (declining to address argument because defendant waived it). But nearly every circuit to have considered the issue has acknowledged that there are circumstances where a "completed misdemeanor" can give rise to the reasonable suspicion needed to conduct a *Terry* stop. *See, e.g., United States v. Hughes*, 517 F.3d 1013, 1017 (8th Cir. 2008) (following the Ninth and Tenth Circuits and concluding that, to determine whether a stop was justified, a court should balance the "nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion"); *United States v. Moran*, 503 F.3d 1135, 1141–43 (10th Cir.

6

authority he relied on for the proposition that a crime has to be ongoing to justify a *Terry* stop, and he cited to *Reid v. Georgia*, 448 U.S. 438 (1980). (Tr. 95.) To be sure, *Reid* uses the present tense, stating that a *Terry* stop is lawful if supported "by a reasonable and articulable suspicion that the person seized *is engaged* in criminal activity." 448 U.S. at 440 (emphasis added). But both the Supreme Court and the Fourth Circuit have expressed the standard much more broadly, describing a *Terry* stop as permissible "when the officer has reasonable, articulable suspicion that the person *has been, is, or is about to be engaged* in criminal activity." *United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) (emphasis added) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)).

Kelley's reliance on Virginia Code § 19.2-81 is also misplaced. As the Fourth Circuit has reasoned,

> [the defendant's] argument that state law precludes an arrest for a misdemeanor that occurs out of the arresting officer's presence cannot be used to make a federal constitutional case under the Fourth Amendment. *See Street v. Surdyka*, 492 F.2d 368, 371–72, 373 n.7 (4th Cir. 1974). *See also* under Virginia law *Penn v. Commonwealth*, 412 S.E.2d 189 (Va. Ct. App. 1991), *aff'd*, 420 S.E.2d 713 (Va. 1992) (holding that evidence retrieved from a

---

2007) (acknowledging that "perhaps" a completed misdemeanor could serve as the basis for a *Terry* stop and concluding that police responding to complaints of a trespass, which was a completed misdemeanor, had reasonable suspicion to stop a vehicle matching the description of the alleged trespasser's vehicle); *United States v. Grigg*, 498 F.3d 1070, 1081 (9th Cir. 2007) (concluding that, if the totality of the circumstances allow it, a *Terry* stop may be based on a completed misdemeanor, and directing that courts "consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger . . . , and any risk of escalation" caused by, for example, domestic violence). *See also United States v. Antoine*, Crim. No. 10-229, 2012 WL 3765173, at *5 (W.D. Pa. Aug. 30, 2012) (denying motion to suppress and noting that the Third Circuit "has never held . . . that the police cannot conduct a *Terry* stop based upon reasonable suspicion that a misdemeanor, as opposed to a felony, has been committed, and we are not convinced that the appellate court would make such a bright-line distinction"); *Williams v. Speights*, No. 1:05-cv-863, 2011 WL 1097809, at *11 (M.D.N.C. Mar. 22, 2011) (Report and Recommendation of magistrate judge) (recommending that the court should follow the approach of the Eighth, Ninth, and Tenth Circuits on the issue and explaining reasons). *But see Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) (appearing to adopt a bright-line rule, albeit in dicta, that the police may not conduct a *Terry* stop for a completed misdemeanor). Based on this, and absent any binding authority from Kelley saying that the officers had to have a reasonable suspicion that a *felony* had been committed to conduct a *Terry* stop, the court applies the general principles of *Terry* here.

7

> statutorily unlawful misdemeanor arrest is not subject to the
> exclusionary rule).

*United States v. Bryant*, 36 F.3d 1094, 1994 WL 529977, at *3 (4th Cir. 1994) (unpublished table decision). *See also Virginia v. Moore*, 553 U.S. 164, 176–78 (2008) (holding that an arrest and subsequent search were valid under the Fourth Amendment, even if the arrest violated a state law governing the authority of officers to arrest, and explaining that, "while States are free to regulate . . . arrests however they desire, state restrictions do not alter the Fourth Amendment's protections").

Kelley's argument is also unpersuasive because the facts simply do not support his claim that the officers were stopping Kelley to arrest him. Instead, the court finds that this was an investigative *Terry* stop and that the officers were not stopping Kelley to arrest him, but to investigate the allegations of criminal activity. Both officers testified to that effect, and their conduct in exiting the car, with no weapons drawn, and the fact that Officer Getz's first question to Kelley inquired about the domestic incident, all support that assertion. As such, the officers did not need to have probable cause to arrest him, nor a warrant for his arrest. Rather, the court concludes that the validity of the stop here is governed by the two-pronged standard of *Terry*.

The first prong allows an officer to conduct such a stop if she has "reasonable suspicion of criminal activity," which requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016) (citations omitted); *accord United States v. Quarles*, 330 F.3d 650, 653 (4th Cir. 2003) (holding that *Terry's* first prong is satisfied if the officer can point to "specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant intrusion") (quoting *Terry*, 392 U.S. at 21–22). The required "level of suspicion is considerably less than proof of wrongdoing by a preponderance of evidence," *Quarles*, 330 F.3d

8

at 653 (citation omitted). Instead, it is "'commonsense, nontechnical standard' that relies on the judgment of experienced law enforcement officers." *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (quoting *Ornelas v. United States*, 517 U.S. 690, 695). The second prong, which Kelley does not dispute, and so the court does not evaluate, requires that the actions of the authorities during the traffic stop be "reasonably related in scope" to the bases for the seizure. *Id.* at 649.

As to the first prong, the court finds that the totality of the circumstances show that Officers Getz and Adams had a "reasonable, articulable suspicion" that Kelley had just been involved in criminal activity. Based on the testimony of the officers from the hearing, the officers were concerned both about the fact that Kelley had reportedly been involved in a domestic dispute and also that he possessed two guns. The specific facts the officers were told included: (1) his child's mother had called 911, identified herself, and informed dispatch that Kelley was refusing to leave, that he had been tearing up her house, and that he had "taken her TV down"; (2) more than once while conveying the information, the calls had been disconnected; and (3) Kelley possessed two guns. It was true that the officers also knew the caller had refused rescue. But that fact must be balanced against the facts that: (1) Ms. Green felt the situation was enough of an emergency to call 911 in the first place; and (2) the situation did not sound calm, from all that was being reported. The caller had also described the car Kelley was driving, the direction it was traveling, and described his clothing in sufficient detail for officers to believe the car they stopped was being driven by him.[7] The court finds that these facts, taken together, were sufficient to support the stop.

---

[7] Although the information from dispatch also conveyed that Green reported Kelley was driving on a restricted license, neither officer relied on that fact as a reason for pulling him over, according to their testimony, nor did they ask him for a license upon stopping him. Further, the government does not argue that the information about

9

Kelley, though, argues that the officers could not consider the report that he possessed guns as indicative of criminal activity (Mot. 8), and relies heavily on cases, such as the panel decision in *United States v. Robinson*, 814 F.3d 201 (4th Cir. 2016), *vacated and rehr'g en banc granted*, No. 14-4902 (4th Cir. Apr. 25, 2016), and *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), to argue that his possession of a gun cannot support reasonable suspicion because the officers could not assume that the gun was possessed illegally. He also points out—and the government does not contest—that the officers had no information at the time of the stop that he was a convicted felon.

The court concludes that neither *Robinson* nor *Black* precludes consideration of Kelley's possession of weapons in determining that there was reasonable suspicion for a stop. In *Robinson*, a panel of the Fourth Circuit held that in states like West Virginia (and presumably Virginia) that broadly allow public possession of firearms, the mere fact that someone is armed, even in a high-crime area, does not give rise to an inference that they are also "dangerous" so as to allow the police to conduct a frisk during a *Terry* stop. 814 F.3d at 212–13. In so concluding, the court relied in part on *Black*, which it described as holding that "when a state authorizes the open display of firearms, public possession of a gun is no longer suspicious in a way that would authorize a *Terry* stop." *Id.* at 208. Thus, "[w]here it is lawful to possess a gun, unlawful possession 'is not the default status.'" *Id.* at 209 (quoting *Black*, 707 F.3d at 540).

*Robinson* does not control the outcome here for several reasons. First, as Kelley acknowledges, rehearing en banc has been granted and thus the panel decision has been vacated. *Robinson*, No. 14-4902 (4th Cir. April 25, 2016); 4th Cir. R. 35(c) ("Granting of rehearing en

---

the restricted license justified the initial stop. Thus, the court does not consider whether this justification could support the stop here.

10

banc vacates the previous panel judgment and opinion."); *United States v. Saul*, No. 3:15-cr-184, 2016 WL 3181135, at *6 (E.D. Va. June 3, 2016) (noting same).

Even if it were binding precedent, *Robinson* addressed only whether a *frisk* was permitted. There, the court noted that the defendant did not contest the validity of the initial stop, "[n]or could he," since he was stopped for a seatbelt violation. *Robinson*, 814 F.3d at 206. The *Robinson* court noted that the standard for a frisk requires more than that required for an investigative stop. *Id.* A frisk requires that the officer have "a reasonable and articulable suspicion that the person is 'armed and presently dangerous to the officer or to others.'" *Id.* (citations omitted). The defendant in *Robinson* did not challenge the reliability of the anonymous tip to the police and thus did not dispute that there was "reasonable suspicion" that he was "armed." *Id.* The court there simply held that the police did not have reasonable suspicion to believe he was "dangerous." *Id.* at 213.

Further, *Robinson* is distinguishable on its facts. In *Robinson*, the officers knew only that (1) an anonymous 911 caller had reported he "witnessed a black male in a bluish greenish Toyota Camry load a firearm and conceal it in his pocket;" and that (2) when the individual was stopped for a seatbelt violation and asked whether he had any weapons, he did not answer, but gave a "weird look." *Id.* at 204. But the officers here had many more facts than simply a report of a person who happened to be in possession of two guns. Kelley had just been reported as having been in a domestic argument that caused his child's mother to call the police to come get him. They had information that he may have been trespassing, and that he had been "tearing up her house" and done something with her TV. Also, at some point *during* the argument, he either showed her two weapons or, at the very least, two weapons were visible to her. In addition to these facts, the reasonable inferences allowed from them support a reasonable suspicion that a

11

Case 7:16-cr-00022-EKD   Document 72   Filed 08/11/16   Page 11 of 14   Pageid#: 408

crime (or crimes) had just been committed.  Moreover, the fact that only about five minutes had elapsed from the time Ms. Green first contacted dispatch until the time Kelley was stopped after leaving the scene of the disturbance further supports a reasonable suspicion of criminal activity.  Because of the proximity in time, Kelley more closely resembled a person fleeing the scene of a crime than a person lawfully going about his business, as in *Robinson*.

*Black* is similarly distinguishable.  In that case, there were virtually no facts supporting the defendant's seizure, at least insofar as suspecting him of criminal behavior.  As described by the Fourth Circuit, the totality of the circumstances involving Black were:

> an individual's presence at a gas station; prior arrest history of another individual; lawful possession and display of a firearm by another; Black's submission of his ID showing an out-of-district address to [the officer], all of which occurred in a high crime area at night[.]

707 F.3d at 539.  The court concluded, on these facts, that the officers lacked reasonable suspicion to seize Black.  *Id.*  That stands in contrast with the information available to the officers here, as already discussed. *Cf. United States v. Williams*, 57 F. App'x 151, 151–52 (4th Cir. 2003) (per curiam) (holding that the stop of the defendant was supported by reasonable suspicion where the officers received a report that the driver had been in a domestic altercation, that he had previously hit his girlfriend, that he had guns he wanted to discard, and where he fled from the police).

Common sense also dictates that officers should be able to consider Kelley's possession of guns here.  This is so because, even where firearms or other weapons are legally possessed, the potential for violence in an altercation is greater if those weapons are present. *Cf. United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010) (describing that "sound research of unquestionable reliability . . . indicates that the presence of firearms greatly increases the risk of

12

death for women suffering from domestic abuse"); *see also Moran*, 503 F.3d at 1142 (holding that officers had reasonable suspicion for a *Terry* stop based on a completed misdemeanor trespass where the alleged trespasser likely possessed hunting weapons and there had already been a dispute between him and a landowner, because the presence of weapons increased the risk of threat to public safety); *United States v. Fonville*, No. 7:14-cr-43-1H, 2015 WL 9864494, at *3 (E.D.N.C. Oct. 5, 2015) (Memorandum and Recommendation of magistrate judge recommending denial of motion to suppress evidence found after *Terry* stop based on report of domestic violence and noting that "[i]t cannot seriously be debated that the presence of a firearm during the investigation of a violent domestic incident may reasonably pose a threat to the safety of officers or others"). And although here Kelley had left the apartment after Ms. Green told him she had called the police, the guns during the presence of the earlier altercation can be considered as supporting the reasonable suspicion sufficient to support the *Terry* stop.

      Having found that the stop was legal, the court also concludes that the search of the car was supported by probable cause. As Kelley conceded at the hearing, the fact that he possessed and handed over a bag of marijuana to Officer Getz, and the fact that Officer Adams smelled burnt marijuana coming from the cracked window of the car, permitted the officers to search the vehicle. *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (noting that, although the initial investigative stop would not permit a search of the vehicle, where an officer develops probable cause to believe the vehicle contains evidence of criminal activity, it may search the vehicle, and holding that "[a]n officer's detection of marijuana odor is sufficient to establish such probable cause." *Palmer*, 820 F.3d at 650 (citing *United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002)); *Carter*, 300 F.3d at 422 (concluding that where a person is pulled over for a traffic

13

violation and the officer smells burnt marijuana in the vehicle, the officer "clearly [has] probable cause to search the passenger compartment of [the] vehicle without a warrant").[8]

Thus, the motion to suppress was and is denied insofar as it seeks to exclude the guns and other physical evidence seized from Kelley and the car he was driving on January 28.

### III. CONCLUSION

For the reasons set forth above, the court denied defendant's motion to suppress in part at the July 27, 2016 hearing. The court also concludes that the portion of the motion seeking to exclude Kelley's statements on January 28, 2016, and March 18, 2016, will be moot when, and if, Kelley enters a plea of guilty. An appropriate order will be entered at that time.

Entered: August 11, 2016.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

---

[8] The government advanced other arguments in support of the validity of the search. In light of the court's rulings, it is not necessary to address those issues.